**UNITED STATES of America, Plaintiff,**

v.

**Swyn B. NELSON, Tally M. Nelson, Clarence Woods and Jean S. Richard, Defendants.**

**No. 95–CR–6038L.**

United States District Court,
W.D. New York.

June 11, 1996.

Fred S. Gallina, Gallina Law Offices, Rochester, NY, for Swyn B. Nelson, defendant.

Christopher S. Ciaccio, Rochester, NY, John L. DeMarco, Rochester, NY, for Tally M. Nelson, defendant.

Douglas E. Rowe, Rochester, NY, for Clarence Woods, defendant.

Stephen M. Brent, Brent & Bellini, Rochester, NY, for Jean S. Richard, defendant.

Frank Sherman, U.S. Attorney Office, Rochester, NY, for U.S.

## DECISION AND ORDER

LARIMER, Chief Judge.

Defendants in this case are charged in a thirteen-count indictment with various drug- and firearm-related offenses. Defendant Swyn Nelson ("Nelson") has filed motions for

various forms of relief, which are now pending before the court.

## I. Motion to Suppress Evidence in Connection with October 28, 1994 Arrest

### A. Facts

Nelson moves to suppress identification testimony and physical evidence obtained in connection with his arrest by Rochester police officers on October 28, 1994. The court held a hearing on this motion on several days in February and March 1996.

The basis for this motion is Nelson's assertion that probable cause was lacking for Nelson's arrest, and that the circumstances under which two of the officers identified him on October 28 were unnecessarily suggestive. To evaluate these contentions, a brief summary of the relevant events is necessary.

On the night in question, Officer John C. Briggs was in his patrol car at around 12:20 a.m. when he saw a brown Camaro run a red light. He followed the Camaro, which shortly thereafter turned at an intersection without making a full stop. Briggs turned on his flashing lights, at which point the Camaro accelerated. Briggs gave chase and also radioed for assistance.

Officer Lamar Cousins responded to Briggs's call, and was able to block the Camaro's path with his vehicle. The Camaro stopped and a black male jumped out and ran away, throwing an object on the ground as he did so. The object was later recovered and found to be a gun. Briggs and Hans, his police dog, chased the suspect on foot. Cousins also briefly chased the suspect on foot but stopped when he heard another officer (presumably Briggs) yell that a police dog had been released.

Neither Briggs, Cousins, nor Hans caught up to the suspect. However, Officer Donald H. McKeeby was also in the area in his patrol car when he heard a radio report that officers were chasing an individual on foot a few blocks away. He drove to the scene and was told by an officer (McKeeby was not sure which one) that the fugitive was a black male wearing dark clothing and that he had run down a certain alleyway. McKeeby drove his vehicle to the area where he guessed the fugitive might be heading when a black male wearing dark clothing suddenly ran directly across McKeeby's path; McKeeby's car nearly hit him. McKeeby stopped his car and gave chase on foot. He eventually caught up with and apprehended the suspect, who turned out to be Nelson.

Officer Robert S. Roxstrom, who had also responded to the radio calls, then arrived on the scene to find Nelson in handcuffs in McKeeby's custody. He took Nelson to the area where the Camaro had been stopped, and both Briggs and Cousins identified him as the suspect who had fled from the Camaro.

### B. Probable Cause to Arrest

Nelson contends that Officer McKeeby did not have probable cause to arrest him because the information that McKeeby had at the time concerning the suspect's appearance was insufficient to support the arrest.

Since McKeeby arrested Nelson without a warrant, the arrest was valid only if McKeeby had probable cause for the arrest. Probable cause exists when the authorities "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *United States v. Jenkins*, 876 F.2d 1085, 1089 (2d Cir.1989) (citations and internal quotation marks omitted); *see also Dunaway v. New York*, 442 U.S. 200, 208, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979); *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 861–62, 43 L.Ed.2d 54 (1975). A "probable cause determination does not require proof beyond a reasonable doubt; it is the mere probability of criminal activity, based on the totality of the circumstances, that satisfies the Fourth Amendment." *Hahn v. County of Otsego*, 820 F.Supp. 54, 55 (N.D.N.Y.1993), *aff'd*, 52 F.3d 310 (2d Cir.1995).

Probable cause can rest upon the collective knowledge of the police rather than solely on that of the officer who actually makes the arrest when there is some degree of communication between the two. *United*

States v. Webster, 750 F.2d 307 (5th Cir. 1984), cert. denied, 471 U.S. 1106, 105 S.Ct. 2340, 2341, 85 L.Ed.2d 855, 856 (1985). When the arresting officer has no personal knowledge of any of the facts establishing probable cause, however, then the officer who issues the directive to arrest must himself have probable cause to arrest. Id. at 323.

■ It is clear that probable cause to arrest Nelson existed at the time of his arrest by McKeeby. Briggs himself had probable cause to arrest based on Nelson's traffic violations and his attempt to flee after Briggs tried to pull him over. See United States v. Martinez–Gonzalez, 686 F.2d 93, 99 (2d Cir. 1982) (defendant's "hasty retreat" when officers justifiably approached him for questioning transformed officers' reasonable suspicion into probable cause to arrest); United States v. Lopez, 1995 WL 852067 *7 (D.Vt. 1995) (same). Thus, McKeeby was entitled to rely on Briggs's radio call and the information that he received when he arrived on the scene that the suspect was a black male in dark clothing who had just run down an alleyway. The sudden appearance moments later of Nelson, who fit the suspect's description, in the area where McKeeby surmised the suspect might be heading, as well as the fact that Nelson burst into the street without looking for oncoming vehicles first, more than justified McKeeby in pursuing and arresting Nelson.

■ Furthermore, under the circumstances that existed at the time, it was clearly reasonable for McKeeby at least to stop Nelson and detain him long enough to ascertain whether he was the suspect that the other officers had been pursuing. "Courts have time and again approved on-the-scene showups, occurring reasonably soon after the crime, as one of the best ways not only to catch the criminal but also to exonerate the innocent." Dempsey v. Town of Brighton, 749 F.Supp. 1215, 1225 (W.D.N.Y.1990), aff'd, 940 F.2d 648 (2d Cir.), cert. denied, 502 U.S. 925, 112 S.Ct. 338, 116 L.Ed.2d 278 (1991). See also People v. Hicks, 68 N.Y.2d 234, 242, 508 N.Y.S.2d 163, 500 N.E.2d 861 (1986) (police acted reasonably in detaining defendant and transporting him a quarter mile so that witnesses could tell police whether he was one of the perpetrators). Thus, aside from the issue of whether there was probable cause to arrest Nelson, there was ample reason to detain him for purposes of a showup before Briggs and Cousins.

The cases cited by Nelson in support of his assertion that probable cause to arrest was lacking are clearly distinguishable. The primary case relied upon by Nelson is United States v. Shavers, 524 F.2d 1094 (8th Cir. 1975). There, the Eighth Circuit held that probable cause to arrest the defendant for attempted bank robbery did not exist where the officer's arrest of the defendant was based on the facts that: a radio broadcast had stated that one of the two suspects was a black male about 5'8" tall, and the defendant was a 5'7" black male; the defendant was about a block away from the crime scene about ten minutes after the robbery attempt; he was walking fast; and his pants were wet (it had been raining) and had grass on them. In holding that there was no probable cause, the court observed that the neighborhood was about 50% black, and at 9:00 on a weekday morning, many persons fitting the suspect's description could likely have been found. The court also held that the defendant's proximity to the crime scene was not a persuasive factor, since some ten minutes had elapsed since the crime occurred. In addition, the defendant was not running, but only walking quickly, which would not have been unusual given the threat of further rain at the time. Id. at 1095–96.

The facts in the case at bar are clearly distinguishable from those in Shavers. Here, Nelson was running late at night, not walking down a busy street. Furthermore, in Shavers the fact that the defendant was only a block away from the crime scene ten minutes after the crime occurred—and walking at a fast pace—actually weighed against a finding of probable cause, since the would-be robbers could presumably have gotten more than a block away in ten minutes' time. In contrast, Nelson was in the direction and area where McKeeby expected he might find the fugitive, based on what the other officers had told him about the fugitive's direction.

The other cases cited by Nelson are even more dissimilar factually to the instant case. In *United States v. Nicholas,* 448 F.2d 622 (8th Cir.1971), police officers observed a car with out-of-state license plates parked near a pool hall in an area known for a high incidence of drug trafficking. One man was sitting on the passenger's side, and another man came out of the pool hall and entered the car on the driver's side. The officers approached the car and told the driver to roll down his window. When he did so, the officers smelled burnt marijuana, arrested the men, and searched the car, turning up certain contraband. The Eighth Circuit held that the officers did not have probable cause to arrest. Among other factors contributing to this holding, the court noted that the officers were not investigating any crime at the time, nor had they been informed of any suspicious activities in the area.

In *United States v. Strickler,* 490 F.2d 378 (9th Cir.1974), the court, by a 2–1 majority, found a lack of probable cause to arrest where the only facts known to the officers at the time of the arrest were that: the parked car that the defendant was sitting in was near a residence where undercover police officers were expecting a cocaine delivery to be made; the car had slowly driven through the area a short time earlier; and the defendant was looking in the direction of the house in question.

In *United States v. Bazinet,* 462 F.2d 982 (8th Cir.), *cert. denied,* 409 U.S. 1010, 93 S.Ct. 453, 34 L.Ed.2d 303 (1972), the court held that the police had probable cause to arrest the appellant Bazinet's codefendant, but not to arrest Bazinet, because, as the police themselves admitted, they had "no information whatever to connect Bazinet with the commission of any crime, other than the fact that an officer [at the arrest scene] recognized Bazinet as a convicted felon." *Id.* at 988. Furthermore, the arresting officer testified that the main reason he arrested Bazinet was the codefendant's presence in Bazinet's vehicle. *Id.*

All of these cases present factual situations much different from the one in the case at bar. The officers here were legitimately pursuing a fugitive who had fled when Briggs justifiably attempted to stop his vehicle. The arresting officer, McKeeby, was looking for the fugitive when Nelson, who fit the fugitive's description, ran past him in the area where McKeeby expected to find the fugitive. That combination of circumstances was more than enough to give rise to probable cause to arrest.

### C. Identification Testimony

■ Nelson also contends that the out-of-court identifications of Nelson by Officers Briggs and Cousins after Officer Roxstrom brought Nelson to them should be suppressed because the officers' actions amounted to an impermissibly suggestive "showup" procedure.

■ Pretrial identification testimony will be suppressed only if the identification was unduly suggestive, and that suggestiveness rendered the identification unreliable. *United States v. Nersesian,* 824 F.2d 1294, 1318 (2d Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). In accordance with the Supreme Court's decision in *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the determination must be based on a "totality of the circumstances" surrounding the identification.

Considering the circumstances that existed at the time of the identifications by Briggs and Cousins, I find that the procedure followed here was not unduly suggestive. This was not a case in which the police apprehended a suspect and then brought him to a crime victim. This case involved a hot pursuit by several officers, one of whom, McKeeby, apprehended a suspect fitting the fugitive's description. In light of the fluid situation, he was certainly justified in bringing Nelson to Briggs and Cousins to see if he had the right person.

The Second Circuit has recognized that a "prompt showing of a detained suspect at the scene of arrest has a very valid function: to prevent the mistaken arrest of innocent persons." *United States v. Bautista,* 23 F.3d 726, 730 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994). The court has therefore "instructed law enforcement officials that where an officer has

'or should have doubts whether a detained suspect is in fact the person sought, the officer must make "immediate reasonable efforts to confirm the suspect's identity." '" *Id.* (quoting *United States v. Valez,* 796 F.2d 24, 27 (2d Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 957, 93 L.Ed.2d 1005 (1987)).

In the instant case, although McKeeby had probable cause, based on the suspect's description and the surrounding circumstances, to arrest Nelson, the fact remains that all he had at that point was a description from another officer. When he apprehended Nelson, therefore, he could not be certain that he had arrested the fugitive that Briggs and Cousins had been following. It was therefore reasonable for Roxstrom to take Nelson to Briggs and Cousins for purposes of making an identification.

Obviously, there was some suggestiveness in taking a single person in handcuffs to Briggs and Cousins and asking them if he was the suspect. Nevertheless, to warrant suppression, the procedures followed must have been *unnecessarily* suggestive. *Bautista,* 23 F.3d at 730. Considering the legitimate concerns expressed by the court in *Bautista* about the need to guard against mistakenly arresting innocent persons, the procedures followed here were not unnecessarily suggestive. To hold otherwise would mean that an officer in McKeeby's or Roxstrom's situation would have to take the arrestee to the police station for a full-blown lineup. If in fact the wrong person had been apprehended, such a procedure would both hamper effective law enforcement (inasmuch as the officer would have to leave the area where the actual suspect remained at large, thus reducing the number of officers available to look for the suspect), and could prove far more bothersome to the person apprehended, since he would have to remain in custody at least as long as it took to conduct the lineup. In view of these considerations, I conclude that the procedures followed in this case were not unduly suggestive. To the extent that the accuracy of Briggs's and Cousins's identifications can be called into question, that is a matter best left for cross-examination at trial. *United States v. Archibald,* 734 F.2d 938, 940 (2d Cir.1984), *modi-*

*fied on other grounds,* 756 F.2d 223 (2d Cir.1984).

## II. Motion to Suppress Evidence in Connection with Events on June 21, 1995

Nelson also moves to suppress evidence obtained in connection with his arrest on June 21, 1995, on the ground that his arrest violated the Fourth Amendment.

The arresting officer, Thomas Tasick, testified at the suppression hearing that on June 21, 1995, he was part of a team of officers who executed a warrant to search a residence at 774 Clifford Avenue in Rochester. The warrant, which had been issued earlier that day by Monroe County Court Judge John J. Connell, authorized the police to search 774 Clifford Avenue for cocaine and other specified items relating to drug trafficking. In addition, the police also possessed a second warrant that had also been signed that day by Judge Connell, authorizing the police to search the person of Swyn Nelson, wherever he might be found. The warrant specifically authorized the police to search Nelson for cocaine, drug paraphernalia, money, and unlawfully-possessed weapons.

Tasick testified that he was assigned to work the outer perimeter of the area around the building during the search and that he was standing on the west side of the building some forty to fifty feet from the house when a New York State Police SWAT team entered the building. Shortly thereafter, Tasick heard someone shout or say the word "basement," and almost immediately thereafter he saw a male stand up in the grass near a basement window.

Tasick and other officers approached the man and directed him to stop and lie on the ground. The man, later identified as Nelson, did so and Tasick immediately handcuffed him. Tasick testified that he handcuffed Nelson for safety reasons. Because the SWAT team was being used, Tasick thought it likely that the occupants of the building were believed to have weapons.

Tasick asked Nelson whether he had any weapons, narcotics or cash and Nelson allegedly stated that he had $2,300. Nelson was

taken to a police vehicle and searched. Money was removed from his right pants pocket.

Tasick testified that he stopped Nelson within about five minutes of the initial execution of the warrant. He recalled that Nelson was about ten to fifteen feet from the side of the building when he first stood up. Tasick believed that Nelson had come out of the basement window when the warrant was being executed. Although Tasick did not actually see Nelson exit the basement window, he believed that Nelson must have come from there since Tasick was able to observe the west and rear side of the building.

Tasick did not recall any specific instructions that he had received on June 21 concerning the execution of the warrant, but he stated that it was his intention to stop and detain anyone who left the building. He stated that he may have heard the name Nelson mentioned at briefings prior to the execution of the warrant, but he did not know Nelson and did not have any information that a warrant to search Nelson himself had been issued.

Based on these facts, Nelson contends that the seizure and search of himself was unlawful. He asserts that although the police had authority to detain persons within the premises being searched, that authority did not extend to persons standing outside the building.

▮ Based on the facts developed at the suppression hearing, I am not persuaded by defendant's argument. Although a warrant to search a building does not give the police unlimited authority to detain and search anyone and everyone in the vicinity of the building, that is not what happened here. Based on his observations, Officer Tasick reasonably inferred that Nelson had just emerged from a basement window while the search of the building was in progress. Under the circumstances, he was justified in detaining and searching Nelson for the sake of his own and the other officers' safety.

▮ "Absent special circumstances, the police ... have the authority to detain occupants of premises while an authorized search is in progress, regardless of individualized suspicion. They also have the authori-

ty to make a limited search of an individual on those premises as a self-protective measure." Rivera v. United States, 928 F.2d 592, 607 (2d Cir.1991) (citing Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)). "Beyond this general authority to detain persons and make limited security searches, however, there must be probable cause, or at least some degree of particularized suspicion, to justify further searches or seizures of individuals who are neither named in the warrant nor arrested as a consequence of the search." Rivera, 928 F.2d at 606.

In the case at bar, Tasick was entitled to detain Nelson and conduct a limited search for safety reasons. Nelson's emergence from a basement window during the search also gave rise to a reasonable suspicion that he might be armed or attempting to remove contraband from the house, which further justified the search.

In support of his assertion that the arrest was unlawful, Nelson relies on Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), in which the Supreme Court held that officers executing a warrant to search a tavern lacked reasonable suspicion to frisk a patron who happened to be on the premises but who had done nothing suspicious. Id. at 91, 96, 100 S.Ct. at 342, 344–45. Nelson's reliance on Ybarra is misplaced, however. Unlike the defendant in Ybarra, Nelson was not merely standing innocently in a public tavern. Id. at 88, 100 S.Ct. at 340–41. Rather, he had apparently just emerged from a basement window—hardly a conventional manner of exiting a building—just after the police began executing a warrant to search the house. Nelson's behavior therefore clearly suggested a desire to escape, which itself suggested his possible involvement in the suspected drug activity inside the house.

In United States v. Barlin, 686 F.2d 81 (2d Cir.1982), agents had discovered drugs in a residence that they were searching pursuant to a warrant when two men and a woman walked in. The police had an arrest warrant for one of the men, and he was immediately arrested. The woman was patted down. Several minutes later, an agent noticed the

woman's purse nearby and searched it, finding $5000 in cash and a quantity of cocaine. On appeal, the Second Circuit upheld the detention of the woman and the search of her bag. The court noted that although the woman was unknown to the agents at the time, she "was not innocuously present in a crowd at a public place" like the defendant in *Ybarra.* *Id.* at 87, 100 S.Ct. at 340. Instead, she was entering a building where drug deals had occurred, in the company of a known drug dealer. The search of the purse, the court concluded, "was hardly gratuitous in these circumstances," since the purse was a likely place to conceal a weapon. *Id.* Furthermore, even though up to fifteen minutes had elapsed between the woman's entry into the building and the search of the purse, "the mere passage of time did not immunize the pocketbook from search." *Id.* The court observed that it would have been unwise for the agents to have put their safety at risk by simply handing the defendant her bag and releasing her. *Id.*

I find the instant case to be more similar to *Barlin* than to *Ybarra.* As in *Barlin,* the police had reason to believe that the defendant here was involved in illegal drug activity, since he was apparently attempting to sneak out of a known drug house during a search. Given the "virtual omnipresence of firearms in the illegal drug business," *United States v. Espinoza,* 826 F.2d 317, 319 (5th Cir.1987), it was entirely reasonable for Tasick to stop Nelson and conduct a limited search of his clothing.

In *Summers,* 452 U.S. at 702, 101 S.Ct. at 2594, the Supreme Court, in upholding the detention and subsequent search of a defendant who was leaving a house just as the police were approaching to execute a search warrant, observed that "[a]lthough no special danger to the police [wa]s suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." Likewise, in the case at bar the situation confronting Officer Tasick was a fluid one in which defendant suddenly stood up outside a basement window as a SWAT team (the use of which, as Tasick reasonably inferred, suggested that the presence of weapons was believed to be likely) was searching the house for drugs. For the safety of himself, his fellow officers, and the public, Tasick was justified in stopping and searching Nelson. *See also United States v. Cochran,* 939 F.2d 337, 339–40 (6th Cir.1991) (stop and detention of defendant shortly after he drove away from residence, which police officers had warrant to search, was proper under *Summers* ), *cert. denied,* 502 U.S. 1093, 112 S.Ct. 1166, 117 L.Ed.2d 413 (1992); *United States v. Harvey,* 897 F.2d 1300, 1304 (5th Cir.) (police officers were justified in stopping and frisking defendant, who drove up in alley adjacent to house being searched for drugs, since house was well-known as site of frequent drug deals, and officers could infer both that defendant had arrived to either buy or sell drugs, and that he might be armed), *cert. denied,* 498 U.S. 1003, 111 S.Ct. 568, 112 L.Ed.2d 574 (1990).

The possibility that Nelson may have been attempting to remove contraband from the house also supported Tasick's actions. *See United States v. Young,* 909 F.2d 442, 446–47 (11th Cir.1990) (police were justified in ordering defendant to halt after she left house as police were approaching to conduct search warrant, and to search her purse based on suspicion that she was fleeing with evidence), *cert. denied,* 502 U.S. 825, 112 S.Ct. 90, 116 L.Ed.2d 62 (1991).

## III. Other Motions

### A. Motion for Discovery

■ Defendant moves for discovery pursuant to Fed.R.Crim.P. 16, the Jencks Act, 18 U.S.C. § 3500, and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Defendant also requests disclosure of the names, addresses, and prior convictions of the government's witnesses three weeks before trial.

In ruling on these requests, I have considered the extent of the government's voluntary disclosure of information, and the government's acknowledgment of its continuing duty to disclose material discoverable under Rule 16 and *Brady.* I am satisfied by the government's representations here, and find

that there is no need for an order as requested by defendant.

I direct the government to turn over the names of its witnesses and any witness statements covered by the Jencks Act at the pretrial conference. Defendant's motion is otherwise denied, except to the extent that the government has provided or agreed to provide the documents requested.

### B. Rule 404(b) and Rule 609 Material

Defendant moves for discovery and limitation of the use of evidence of prior bad acts and impeachment material pursuant to Rules 404(b) and 609. Defendant also requests a hearing to determine the admissibility of such evidence.

I find that a hearing on this matter is not necessary at this time. I will reserve on these matters and review this issue with the parties at the pretrial conference. Therefore, I will defer ruling on the introduction of this evidence until that time. At the pretrial conference, the Government must set forth all the evidence of this type that it intends to use at trial.

### C. Grand Jury Proceedings

Defendant moves for discovery relating to various aspects of the grand jury proceedings that led to his indictment. Defendant also moves to dismiss the indictment based upon alleged irregularities in the grand jury proceedings.

There is a presumption that grand jury proceedings are lawful and regular, *United States v. Torres*, 901 F.2d 205, 232 (2d Cir.) (quoting *Hamling v. United States*, 418 U.S. 87, 139 n. 23, 94 S.Ct. 2887, 2918 n. 23, 41 L.Ed.2d 590 (1974)), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990), and disclosure of grand jury proceedings is available only by order of the Court. Fed.R.Crim.P. 6(e). A party seeking disclosure of grand jury proceedings bears the burden of establishing a "particularized need" or "compelling necessity" for such disclosure which outweighs the policy of grand jury secrecy. *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979); *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400, 79 S.Ct. 1237, 1241, 3 L.Ed.2d 1323 (1959); *In re Rosahn*, 671 F.2d 690, 695 (2d Cir.1982). Unspecified allegations of impropriety or mere speculation are not sufficient to satisfy this heavy burden. *United States v. Calandra*, 414 U.S. 338, 345, 94 S.Ct. 613, 618–19, 38 L.Ed.2d 561 (1974). Therefore, "review of grand jury minutes is rarely permitted without specific factual allegations of governmental misconduct." *Torres*, 901 F.2d at 233.

Defendant has not advanced any proof controverting the presumption of regularity in the grand jury proceedings in this case. *See, e.g., In re Grand Jury Proceedings*, 632 F.2d 1033, 1041 (3d Cir.1980). Defendant's has therefore failed to establish a particularized need for disclosure of the grand jury proceedings. *United States v. Williams*, 644 F.2d 950, 952 (2d Cir.1981).

Furthermore, under federal law, a defendant may not challenge an otherwise valid indictment upon the grounds that the evidence before the grand jury was insufficient or incompetent. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). A claim that inspection of the grand jury proceedings is necessary to allow for preparation of motions does not satisfy the defendant's burden in this instance. *United States v. Leo*, 406 F.Supp. 1174 (E.D.Wis.1976). This motion is therefore denied.

### D. Disclosure of Informants

Defendant moves for disclosure of the identity of any informants that were used in this case. The government states that no informants were used. This motion is therefore denied.

### E. Dismissal of Indictment

Defendant moves to dismiss the indictment on the grounds that it is insufficient on its face. He contends that the indictment simply tracks the language of the statute and fails to set forth the essential facts of the offenses charged.

It is well settled that an indictment is sufficient "if, first, it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecution for the same offense." *Hamling,* 418 U.S. at 117, 94 S.Ct. at 2907. Moreover, "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.'" *Id.* (quoting *United States v. Carll,* 105 U.S. 611, 26 L.Ed. 1135 (1881)).

The indictment here meets this standard. It sets forth the times and places when defendant is alleged to have possessed the drugs, weapons and other contraband in question. The motion to dismiss the indictment is therefore denied.

### F. Renewal of Motions

Defendant requests that he be permitted to renew his motions later if a basis arises for doing so. This motion is granted to the extent that such additional motions are not untimely and that they were not or could not have been raised earlier.

### CONCLUSION

Defendant's motions (Item 11) for discovery is granted to the extent that the government has provided or agreed to provide the documents requested, and to the extent that the government is directed to turn over the names of its witnesses and any witness statements covered by the Jencks Act at the pretrial conference.

The court reserves on defendant's motion for discovery and limitation of the use of evidence of prior bad acts and impeachment material pursuant to Rules 404(b) and 609.

In all other respects, defendant's motions for discovery, to suppress evidence, to dismiss the indictment, and for other relief are denied.

IT IS SO ORDERED.